WASHBURN *v.* WAITE.

EQUITY—REHEARING—NEWLY-DISCOVERED EVIDENCE.
In suit against bank's receiver to enjoin sale of corporate stock alleged to have been pledged as security for loan, motion for rehearing should have been granted, where bank's cashier was dead, and only short time elapsed between time bill was filed and hearing thereon, in view of showing by depositions that witnesses were out of State and unavailable at time of hearing, and that newly-discovered evidence would add to record severely limited by prohibition of testimony as to matters equally within knowledge of deceased (3 Comp. Laws 1929, § 14219), and that said evidence would be of material aid in arriving at truth.

Appeal from Gogebic; Driscoll (George O.), J. Submitted June 8, 1933. (Docket No. 58, Calendar No. 37,218.) Decided October 2, 1933.

Bill by Arthur D. Washburn and another against Daniel Waite, receiver of the Iron National Bank of Ironwood, to enjoin the sale of certain shares of corporate stock in satisfaction of pledgee's lien. Decree for plaintiffs. Defendant appeals. Reversed, and remanded.

*Edward W. Massie,* for plaintiffs.

*Wm. G. Cloon,* for defendant.

BUTZEL, J. In 1923, Arthur D. Washburn, as an original incorporator, acquired a substantial interest in the Ironwood Auto Service Company. In 1930, he purchased a large block of stock held by

Dr. L. O. Houghten, then a majority stockholder. After the declaration of a 66 2/3 per cent. stock dividend, Washburn held 376 of 500 shares of stock outstanding, according to a finding by the trial court. The par value of this stock was $100 per share.

In 1923, at or about the time Washburn first acquired his interest in the company, he and his wife borrowed $5,000 from the Iron National Bank of Ironwood, Michigan, and, as security therefor, gave a mortgage on an interest in some Wisconsin lands. The mortgage note was renewed on September 29, 1924. Defendant introduced as evidence of the deposit of collateral for this renewal note a duplicate carbon receipt, found in the records of the bank, and reading as follows:

"Received of A. D. Washburn Certificate No. 2 Ironwood Auto Service Co.—for (50) shares of stock—par value $5,000 held as collateral to note of Margaret Washburn and A. D. Washburn dated September 29, 1924. Sept. 14, 1925. Iron National Bank, By F. R. Burrell, Cashier."

The $5,000 note was renewed from time to time and small payments were made thereon. It is conceded that the sum of $3,650 is still due on the last renewal note, dated January 10, 1931.

In 1930, when Washburn acquired Dr. Houghten's stock in the Ironwood Auto Service Company, priced at $19,000, he required a large sum of money to consummate the deal. He borrowed $7,000 from the Iron National Bank, giving his notes for $5,000 and $2,000, respectively. The latter note was indorsed by the Ironwood Auto Service Company, and has since been paid and returned to Washburn. Washburn still owes the bank $8,650, the aggregate of the

$5,000 note and the $3,650 renewal note dated January 10, 1931. To complete the purchase, Washburn also borrowed $10,000 from the City National Bank of Duluth, Minnesota, on a note indorsed by Fred R. Burrell, cashier of the Iron National Bank, and guaranteed by Bernard A. Morgan, president of the latter institution and a brother-in-law of Washburn. This note recited that it was secured by a pledge of 160 shares of stock of the Ironwood Auto Service Company. Successive renewals were made for lesser amounts, reciting the pledge of a smaller number of shares as collateral, until the entire sum was paid. Dr. Houghten still holds a note for $3,000 which is as yet unpaid.

Fred R. Burrell, cashier of the Iron National Bank of Ironwood, acted in a dual capacity, both as Washburn's banker and as his confidential agent. Burrell, who had been admitted to the practice of law in Minnesota, took charge of the amendment of the Auto Service Company articles and all other legal steps necessary to authorize an increase of the capital stock. Shortly after the purchase of the Houghten shares, the stock book of the Auto Service Company was delivered to Burrell at the bank. The book, which was kept in a drawer in his desk, contained a large number of stock certificates duly executed, including those which are the subject of this controversy. They were made out to Washburn and indorsed in blank by him. It is the claim of plaintiffs that the stock book was delivered to Burrell solely for the purpose of checking up the certificates and also to enable him to deliver shares to future purchasers of the stock. The validity of a number of deliveries purporting to have been so made is not questioned.

Following the sudden and violent death of Burrell on May 22, 1931, the affairs of the Iron National Bank were examined, the bank closed, and Daniel Waite appointed receiver by order of the comptroller of currency. Among the. assets of the bank were found Washburn's notes for $3,650 and $5,000, as hereinbefore described. In the collateral file, kept in a safe inside the large bank vault and under the sole control of Fenton J. Manning, formerly assistant cashier and now aide to the receiver, were found 134 shares of stock of the Ironwood Auto Service Company, represented by certificates for 54, 50, 25 and 5 shares, respectively. They were filed under Washburn's name.

It was the custom of the bank to keep all of its notes, including those involved in the present suit, in a note file consisting of two divisions, one for the notes maturing during the current month and the other for those due later. All collateral to notes was alphabetically arranged and kept in three files, distinct and separate from the note file. Manning alone had the combination of the inner vault in which collateral was kept, and Burrell was unable to open it. Currency was placed on one side of the inner safe or vault and collateral on the other. The two Washburn notes contain no collateral provisions, except that on the left-hand side of the first note given for $5,000 and secured by the Wisconsin land, there is written in lead pencil the word "collateral." On the right-hand side of the $5,000 note given to the Ironwood bank on September 27, 1930, which is still unpaid, there is also penciled the abbreviation "coll." The testimony failed to reveal definitely the circumstances under which these notations were made.

Other shares of stock claimed by Washburn were found in the files. A note signed by Chris P. Banderob for $2,000 was found, attached to two certificates representing 25 shares of stock in Washburn's name and indorsed in blank by him. A certificate for 20 shares was also found attached to the note of the Mahquah Company, a Minnesota corporation. Ten more shares, securing a note of Fred R. Burrell, were discovered in the collateral file.

Upon Washburn's failure to make payment of the $3,650 and $5,000 notes, the receiver gave notice of a pledge sale in accordance with 2 Comp. Laws 1929, §§ 9561–9563. The sale was held on April 9, 1932, and the 134 shares of stock claimed to have been pledged by Washburn were bid in by the receiver for the sum of $1,000. Prior to the posting of the notice of sale, there had been considerable discussion and some correspondence between the receiver and Washburn and his attorney in regard to the Banderob, Mahquah Company, and Burrell collateral. It seemed to be taken for granted that there was no irregularity in regard to the 134 shares alleged to have been pledged by Washburn, though the record does show that Washburn made some objections which he was apparently willing to waive, provided he was given an extension of time in which to pay the notes. It appears that the receiver at one time was also willing to grant the extension, provided new notes were executed conferring upon the receiver the right to sell the pledge at public or private sale. Washburn claims that these negotiations were solely for the purpose of settlement, and that testimony in regard to them is therefore improper. It is unnecessary to discuss this question at the present time.

Preceding the sale of the 134 shares of stock, Washburn and his wife filed a bill against Daniel Waite, receiver of the Iron National Bank of Ironwood, seeking to enjoin the sale. It was alleged by plaintiffs that the receiver had in his possession 179 shares of stock belonging to Arthur Washburn, and that defendant receiver had threatened to sell 134 shares at public sale on the theory that they constituted collateral for loans made to Washburn. While the main relief sought in the bill is the enjoining of the sale, there is the usual clause asking for further and equitable relief. Defendant claimed at the hearing that, due to the manner in which the bill was framed, he had reason to believe that the rights in the 134 shares would be the only question considered, and that he was for that reason unprepared to meet the issues in regard to the other shares.

At the hearing, it was believed by all parties that Banderob, supposedly the maker in one of the collateral notes, was a fictitious person. The trial judge was very much impressed with the claim that, if Burrell was dishonest with regard to the Banderob note, he had acted fraudulently in respect to the Washburn pledge and other transactions considered at the hearing. It was claimed that Washburn was a man of responsibility, and that Burrell had converted stock certificates of the Ironwood Auto Service Company, belonging to Washburn, and had applied them as collateral to various notes in order to avoid criticism by the national bank examiners. The record is very incomplete in this regard, as well as in many others. The trial court handed down an opinion finding in favor of plaintiffs on July 8, 1932, and holding that the application of the shares of stock as collateral was unauthorized in each and every case. A motion for rehearing

was made and denied before a final decree was rendered on November 11, 1932.

The bill of complaint was filed on April 8, 1932, and the hearing, lasting but two and a half days, began on May 10, 1932. Attorney for defendant claims that he was given insufficient notice of hearing, that the trial judge inversed his usual order of business by calling the chancery cases first. We accept the judge's statement that due notice was given of this change in procedure. Such unusual developments are set forth in the petition for rehearing, however, that we are constrained to believe that it should have been granted, particularly in view of the fact that only the brief interval of 32 days elapsed between the time the bill was filed and the hearing. When it became apparent at the hearing that the rights in the entire 179 shares of stock were going to be put in issue, there was insufficient time to meet the new issues. Several of the affidavits accompanying the petition were signed by witnesses who were out of the State and unavailable during the hearing. On the showing made by defendant in his petition, and in view of the fact that the newly-discovered evidence would add to a record severely limited by the prohibition of testimony as to matters equally within the knowledge of the deceased (3 Comp. Laws 1929, § 14219), we believe that a rehearing will be of material aid in arriving at the truth. We appreciate the necessity for a prompt and final disposition of litigation and are not unmindful of the reluctance of our court to grant such petitions. *Saginaw Suburban R. Co.* v. *Connelly,* 146 Mich. 395; *Lisiak* v. *Lupienski,* 241 Mich. 119. However, we believe the peculiar circumstances present in this case merit a rehearing. In *Sheldon* v. *Hawes,* 15

Mich. 518, it was said, with reference to a similar petition:

"Nor is the testimony merely cumulative in any proper sense of the term. It is the only positive testimony which has come to light in the whole record, except that of the interested parties, and, if true, it would entirely overthrow the case sworn to by the complainant. We think justice required that testimony of this kind should be secured, and that the cause should have been opened for that purpose.

"We do not think the case, as presented by the other testimony in the cause, is by any means satisfactorily made out, in such a way that we should feel at all confident that we could fully see through the mystery in which it is involved. We therefore prefer reversing the decree on the ground already mentioned, and opening the case to further light, instead of deciding it upon the imperfect proofs now in."

On the present record, we are much impressed with defendant's claims as to the 134 shares and are in considerable doubt as to the rights in some of the other shares. However, in view of the unsatisfactory condition of the record and the fact that there is to be a rehearing, we reserve final decision in regard to all of the shares.

Defendant's petition for rehearing was promptly filed. It referred to the annexed affidavit of Charles Banderob, theretofore supposed to have been a fictitious person. Banderob showed that he resided in Duluth, Minnesota, and that he had given the bank his note for $2,000, secured by 20 shares of Ironwood Auto Service Company stock. Another affidavit by Dr. Houghten, now residing in California, states that Washburn told him that he had deposited 50 shares of stock with the bank to secure his original $5,000 note; that, some years later,

Washburn again told deponent that the 50 shares of stock were still held by the bank as collateral. Still another affidavit, by the vice-president of the City National Bank of Duluth, shows that, notwithstanding the provisions with regard to collateral in the note and renewals thereof, given by Washburn to the City National Bank of Duluth, no collateral ever was actually deposited and the bank looked solely to the guaranty of the notes by Morgan and Burrell. We are further impressed with the fact that, before the court can make a final and binding determination with regard to all matters concerning the Banderob, Mahquah Company, and Burrell notes, Banderob, the Mahquah Company, and the Burrell estate should be joined as parties defendant.

Some question has arisen as to the regularity of the pledge sale. There may have been a slight although not serious irregularity in failing to keep the sale open for an entire hour, as announced at the opening of the sale. Should the chancellor, on a rehearing, find that there was such an irregularity, it is suggested, but not ordered, that plaintiffs be given 10 days from the date of the entry of the decree within which to redeem the stock upon payment of the amount due, together with interest and all lawful charges.

The decree is reversed, with costs to defendant, and the case remanded for a rehearing.

McDONALD, C. J., and POTTER, SHARPE, NORTH, FEAD, and WIEST, JJ., concurred. CLARK, J., took no part in this decision.